# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: November 30, 2021

```
* * * * * * * * * * * * * *
CHRISTINE MCGEE,              *      No. 18-1778V
                             *
          Petitioner,        *      Special Master Sanders
                             *
v.                           *
                             *
SECRETARY OF HEALTH          *      Fact Finding; Onset of Injury;
AND HUMAN SERVICES,          *      Influenza ("Flu") Vaccine;
                             *      Shoulder Injury Related to Vaccine
          Respondent.        *      Administration ("SIRVA")
* * * * * * * * * * * * * *
```

*Andrew Downing,* Van Cott & Talamante, PLLC, Phoenix, AZ, for Petitioner.
*Jennifer Reynaud,* U.S. Department of Justice, Washington, DC, for Respondent.

## FACT RULING[1]

On November 16, 2018, Christine McGee ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program.[2] Pet. at 1, ECF No. 1. Petitioner "request[ed] compensation on her behalf, under [the Program] after suffering a left shoulder injury as a result of the incorrect administration of an influenza vaccination she received on October 24, 2017." *Id.* In her petition, Petitioner noted that she "expected to experience some discomfort over the following few days after the shot, but[] almost immediately after receiving it, felt pain that was more severe and unusual." *Id.* at 2. Petitioner continued that despite her attempts to self-medicate, she eventually had to seek treatment from an occupational medical specialist on April 4, 2018. *Id.* Petitioner makes a claim for a Table injury, asserting that her injury satisfies the definition of shoulder injury related to vaccine administration ("SIRVA") codified at 42 U.S.C. § 300aa-14. *Id.* at 1. Alternatively, Petitioner claims her injuries were caused-in-fact by her vaccination. *Id.* Respondent filed his Rule 4(c) report on January 17, 2020, and concluded that "this case is not appropriate for compensation under the terms of the Vaccine Act." Resp't's Report at 1, ECF No. 25. Respondent argued that Petitioner has a chronic pre-vaccination injury that "would explain

---

[1] This fact ruling shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B).  Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted fact ruling. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program").  Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Petitioner's symptoms." *Id.* at 4. Respondent also noted that Petitioner cannot establish pain onset within 48 hours of vaccination because she did not seek medical care for 162 days following receipt of her flu vaccine. *Id.* at 6. This delay, Respondent wrote, "plac[es] in doubt any recollection by [P]etitioner that her pain began soon after the vaccine." *Id.* Pursuant to my June 23, 2020 scheduling order, Petitioner filed a brief regarding onset, in which she "respectfully requests a determination that her shoulder complaints began on October 24, 2017." Pet'r's Br. at 19, ECF No. 34. For the reasons discussed herein, I find that Petitioner has provided preponderant evidence that her shoulder pain began within 48 hours of her vaccination.

## I. Procedural History

Petitioner filed her petition on November 16, 2018. Pet. at 1. On November 28, 2018, Petitioner filed a personal statement, medical records, her employee immunization record, and workers' compensation claim documents. Pet'r's Exs. 1–12, ECF Nos. 6-1–6-10, 7-1–7-2. Petitioner also filed a statement of completion on November 28, 2018. ECF No. 8. Petitioner submitted a VAERS report on December 4, 2018. Pet'r's Ex. 13, ECF No. 10-1. On April 3, 2019, Petitioner filed the witness statement of Matthew Brady, R.N. Pet'r's Ex. 15, ECF No. 15-1. Petitioner filed an additional witness statement of Kaitlyn Ekema, on August 1, 2019. Pet'r's Ex. 16, ECF No. 20.

On January 17, 2020, Respondent filed his Rule 4(c) report recommending compensation be denied. Resp't's Report at 1. Petitioner filed her complete vaccination record on January 30, 2020. Pet'r's Ex. 17, ECF No. 26-1. Following the parties' participation in a status conference, the chief special master informed the parties that he "examined the evidence in this case regarding onset, including the affidavits and other corroborating evidence submitted by Petitioner, and would likely find that the record sufficiently demonstrates that the onset of Petitioner's symptoms occurred within 48 hours of her receiving the influenza vaccine." Order, ECF No. 27. The chief special master ordered Respondent to file a status report indicating how he would like to proceed. *Id.* In a status report filed on May 18, 2020, Respondent stated his intention to litigate this case. ECF No. 28. Consequently, the case was transferred out of the special processing unit and reassigned to me on May 26, 2020. ECF No. 30. On June 23, 2020, I ordered Petitioner to "file an opening brief and any supporting documentation regarding the onset of her shoulder pain." Order, ECF No. 32. Petitioner filed her memorandum regarding onset on July 30, 2020. Pet'r's Br., ECF No. 34. Respondent filed a response on October 8, 2020. Resp't's Resp., ECF No. 37. Petitioner filed her reply on October 21, 2020. Pet'r's Reply, ECF No. 38. This matter is now ripe for review.

## II. Summary of Relevant Evidence

### a. Medical Records

Prior to October 24, 2017, Petitioner had a medical history that was significant for neck pain and left arm numbness. Pet'r's Ex. 7 at 40, ECF No. 6-7. On March 3, 2014, Petitioner was seen by Shannon Sealey, N.P., with ACP-Arizona Internal Medicine Specialists. *Id.* A cervical[3] MRI revealed mild C3/4 neural foraminal narrowing due to a disc bulge; C5/6 shallow posterior-

---

[3] Cervical "pertain[s] to the neck." *Dorland's Illustrated Medical Dictionary* 1, 333 (32nd ed. 2012) [hereinafter "*Dorland's*"].

central disc protrusion with minimal cord compression, but not central stenosis; and a moderate bilateral C5/6 neural foraminal stenosis attributed to a disc bulge. *Id.* at 32–33. N.P. Sealey's recommendations were "differential diagnosis of numbness of [Petitioner's] left arm with patient to include cervical radiculopathy,[4] carpal tunnel syndrome,[5] [and] impingement[6] of the radial or ulnar nerve." *Id.*

Petitioner received treatment through 2015 for neck pain "symptoms [that] tend to wax and wane and has flares every couple months." *Id.* at 10. Petitioner described the pain as "dull, aching sharp in nature," and said it "is localized to the neck and radiates into the suprascapular region." *Id.* She rated the pain at its worse as a ten out of ten. *Id.* Petitioner initially denied any radiating arm symptoms but complained of radiation to the shoulders on February 5, 2015. *Id.* at 10, 75. Petitioner's medical record notes treatment for her chronic neck pain with complaints of left arm paresthesia in July 2016. *Id.* at 57.

On October 24, 2017, Petitioner received a flu shot in her left arm. Pet'r's Ex. 17 at 1. Petitioner's first medical record created post vaccination is from an April 4, 2018 visit with Dennis L. Thrasher, M.D., an occupational medicine specialist. Pet'r's Ex. 9 at 32, ECF No. 6-9. Petitioner presented with complaints of "a dull and constant pain" in her left shoulder that she associated with her flu vaccination. *Id.* Petitioner reported to Dr. Thrasher that she self-treated with ibuprofen every other day. *Id.* Petitioner reported that the pain had gotten worse over the prior two weeks. *Id.* Petitioner denied any weakness, neck pain, or numbness in her arm. *Id.* The examination of Petitioner's left shoulder showed "some fullness" and tenderness in her mid-deltoid region, full range of motion ("ROM"), and no signs of impingement. *Id.* at 33. Dr. Thrasher assessed Petitioner with left shoulder pain associated with vaccine administration, and the treatment plan included X-rays and physical therapy ("PT"). *Id.* The X-rays of Petitioner's left shoulder revealed "[n]o significant abnormality." Pet'r's Ex. 5 at 114, ECF No. 6-5.

Petitioner returned to Dr. Thrasher on April 18, 2018, for "follow up for left shoulder pain chronologically related to a vaccine administration in the left deltoid region." Pet'r's Ex. 12 at 5, ECF No. 7-2. She indicated that her pain was "slightly improved[.]" *Id.* Dr. Thrasher's examination of her shoulder showed "some tenderness and a soft tissue swelling over the lateral deltoid region." *Id.* Petitioner also exhibited limited ROM. *Id.*

An MRI was performed on Petitioner's left shoulder on May 8, 2018. Pet'r's Ex. 5 at 114. The impression section of the record revealed mild superior subscapularis tendinosis,[7] minor acute

---

[4] Cervical radiculopathy is "radiculopathy of cervical nerve roots, often with neck or shoulder pain; compression of nerve roots is a common cause in this area." *Dorland's* at 1571.

[5] Carpal tunnel syndrome is "an entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow. Symptoms result from compression of the median nerve in the carpal tunnel." *Dorland's* at 1824.

[6] Impingement is "advancement of one thing out of its expected place to where it may collide with something else[.]" *Dorland's* at 923.

[7] Tendinosis is also referred to as tendinopathy or tendinitis. It is defined as "inflammation of tendons and of tendon-muscle attachments[.]" *Dorland's* at 1881. The suprascapular region is "above or on the upper part of the scapula." *Id.* at 1806.

or chronic acromioclavicular joint osteoarthritis,[8] and mild subacromial-subdeltoid bursitis.[9] *Id.* at 116; Pet'r's Ex. 9 at 41; Pet'r's Ex. 12 at 7–8.

On May 16, 2018, Petitioner began treatment with PT. Pet'r's Ex. 6 at 1, ECF No. 6-6. Petitioner's PT intake records note that "[Petitioner] had a flu shot in October and had pain but it lingered." *Id*. at 27. The record further notes that it "is decided that it was likely SERVA [sic]." *Id.* Petitioner reported that the "[p]ain has worsened due to working in the PICU with doing a lot of work with fusions and needing to move a lot of children." *Id*. She indicated that she had been able to continue to work on a light duty schedule. *Id*. Petitioner's initial examination revealed weakness and limited ROM in her left shoulder. *Id*.

Petitioner returned to Dr. Thrasher on May 17, 2018, complaining of aggravation of her left shoulder pain due to "doing her regular duties and the lifting involving her patient care activities as a registered nurse." Pet'r's Ex. 12 at 9. Petitioner had full ROM, but Dr. Thrasher's assessment of Petitioner noted "[s]houlder injury related to vaccine administration." *Id.* A medical record dated May 22, 2018, for care unrelated to her shoulder pain also noted Petitioner was "[w]orking NICU while on light duty due to bursitis in shoulder from the flu vaccine." Pet'r's Ex. 4 at 55, ECF No. 6-4. Petitioner saw Dr. Thrasher for a follow-up on June 20, 2018, and she consistently related her shoulder pain and injury to her vaccination. Pet'r's Ex. 12 at 11.

On June 27, 2018, Petitioner was seen by Andrew Mahoney, M.D., an orthopedist, with complaints of a left shoulder injury following the receipt of a flu vaccine on October 24, 2017. Pet'r's Ex. 7 at 28–29. Petitioner noted that her shoulder hurt initially, then it "got a little bit better [before worsening again] when she lifted a patient at work." *Id.* Petitioner was assessed with left shoulder rotator cuff tendinitis. *Id.* On August 18, 2018, Petitioner filled out a VAERS form that described "pain at injection site immediately following vaccination and continued through 8/18/18[, and p]ain with [activities of daily living ("ADL's"), including] sleeping on [her] left side and all the time to some degree." Pet'r's Ex. 13 at 2. Petitioner noted that "[p]hysical therapy has reduced [her] pain level." *Id.*

Petitioner continued to receive treatment from Dr. Mahoney for her shoulder pain through September 2018. Pet'r's Ex. 7 at 77–81. On September 10, 2018, Petitioner returned to Dr. Mahoney where she reported "full [left shoulder ROM] and strength without pain." *Id.* at 77. Dr. Mahoney's examination showed Petitioner had normal ROM and strength with negative impingement signs. *Id.* Petitioner was assessed with recovered left shoulder function, and Dr. Mahoney instructed Petitioner to return to full duty at work. *Id.*

Petitioner attended a total of eighteen PT sessions that concluded on September 20, 2018. *Id*. at 1–2. At the time of discharge, Petitioner was able to push and pull fifty pounds without symptoms and to reach overhead without restriction. *Id*. The recommendation at that time was consistent with Dr. Mahoney's plan for Petitioner to return to full duty at work. *Id*.

---

[8] Acromioclavicular joint osteoarthritis is "inflammation in the acromioclavicular joint." *Dorland's* at 150. The acromioclavicular joint is "the synovial joint between the acromion of the scapula and the acromial extremity of the clavicle[.]" *Id.* at 971.

[9] Bursitis is "inflammation of a bursa, occasionally accompanied by a calcific deposit in the underlying tendon; the most common site is the subdeltoid bursa." *Dorland's* at 264.

### b.   Affidavits

### i.   Petitioner

Petitioner filed two personal affidavits in this case, on November 16, 2018, and March 22, 2019. Pet'r's Aff., ECF No. 1-2; Pet'r's Ex. 14, ECF No. 13-1. In her first affidavit, Petitioner explained that she is a pediatric ICU nurse at Tucson Medical Center ("TMC"), and she receives flu vaccinations every year as a job requirement. Pet'r's Aff. at 1. Petitioner wrote that on October 24, 2017, she received her annual flu vaccine. *Id.* She stated that she had never "experienced any problems with [her] left shoulder prior to October 24, 2017." *Id.* Petitioner further stated that after this vaccination, she experienced "a painful and constant ache" that was different than past vaccines. *Id.* Because of her professional training, Petitioner's "immediate reaction was that the pain would soon wane and, in the interim, [she] could treat it with over-the-counter medication and alternating ice/heat treatment." *Id.*

Shortly after vaccination, on November 8, 2017, Petitioner began a temporary position as a traveling nurse with Kaiser Permanente-Oakland Medical Center ("Kaiser"). *Id.* Unlike TMC, "Kaiser had a great patient transfer and lifting system in place, so [she] was not doing a lot of lifting and [her] shoulder pain was manageable with self-treatment." *Id.* at 2. Once Petitioner returned to her position with TMC in February 2018, she was "having problems using [her] left arm and shoulder while lifting and transferring patients[.]" *Id.* Petitioner wrote that she "tried to ignore [her] pain and work through it, but early in April [of] 2018, [she] determined that it was time to seek help since nothing had changed with [her] shoulder." *Id.*

Petitioner described her first appointment post vaccination with Dr. Thrasher on April 4, 2018. *Id.* She noted that she told him her pain began shortly after her flu vaccination and had recently increased, despite her self-treatment with over-the-counter medications. *Id.* Petitioner recounted her medical treatment, including an MRI and PT, from that initial visit in April through September 2018. *Id.* at 2–3. Petitioner wrote that during her September 5, 2018 PT session, she reported that her "left shoulder pain had resolved."  *Id.* at 3. She noted that she met with Dr. Mahoney on September 10, 2018, and he released her back "to full duty [at work] without restrictions." *Id.* Petitioner stated that she is "back on regular duty, although [she] continue[s] to occasionally suffer some pain in [her] left shoulder." *Id.*

Petitioner's second affidavit provided more background information about her work as a pediatric nurse in the ICU. Pet'r's Ex. 14 at 6. Petitioner wrote that her "long term goal has always been to become a traveling nurse," because her "favorite hobby is landscape photography and exploring new places." *Id.* She noted that she "had a wonderful experience with [her] first travel assignment [from] November 2017 through February 2018 in the [B]ay area." *Id.* Petitioner wrote that she "was looking forward to booking another travel job after coming home to Tucson for a couple of months" but she "was not able to [] since [she] ha[d] been on light duty at work and doing PT [] since May 2018[,] due to SIRVA." *Id.*

She further described the vaccination as "painful as most flu shots are in [her] opinion but did not seem any different than any other flu shots [she had] had every winter at the time." *Id.* She noted, "[t]his injection site continued to be painful though days after the shot." *Id.* Petitioner wrote

that she "expressed [how painful her shot was] to a couple of fellow nurses while at work curious if anyone had ever had long lasting shoulder pain from the flu shot." *Id.* She continued, that she "had never had any problems prior and it seemed odd." *Id.* Petitioner wrote that she "thought perhaps it was just taking a little longer to heal and went about [her] life as usual." *Id.*

Ultimately, Petitioner wrote that she decided to go to employee health after "days, weeks and months passed [and] the pain in [her] shoulder where [she] received the flu shot persisted." *Id.* She had "never had any pain in [her] left shoulder before." *Id.* Petitioner noted that she filed a workers' compensation claim and presented statements from her co-workers "attesting to [her] complaints of persistent shoulder pain post the flu shot." *Id.* Petitioner reiterated that she "did not seek medical care for 5 months since the flu shot but as a nurse [they] tend to grin and bear it when something hurts." *Id.* She wrote that as a result of her injury, Petitioner's employer reassigned her to a different unit and placed her on light duty. *Id.* Petitioner noted that with her accommodations, she was able to continue her work as a pediatric and neonatal nurse. *Id.* However, Petitioner reiterated that she has "not been able to take another travel RN job." *Id.*

### ii. Kaitlyn Ekema

Ms. Ekema is Petitioner's co-worker. Pet'r's Ex. 14 at 7. Ms. Ekema provided the same statement for Petitioner on two different occasions. *Id.*; Pet'r's Ex. 16 at 1, ECF No. 20-1. The first copy was submitted as a part of Petitioner's workers' compensation claim in April 2018. Pet'r's Ex. 14 at 7. The second copy was filed as a statement in this case on August 1, 2019. Pet'r's Ex. 16 at 1. The statement is signed by Ms. Ekema, but it is undated. The complete text is as follows:

> To Whom it may concern:
> In early November of 2016, I worked in the Pediatric Intensive Care Unit with [Petitioner]. On that day she told me that she received her flu shot two weeks ago, but that her arm still hurt a lot. She proceeded to rotate her arm and was unable to fully rotate it upwards due to pain. I do not remember the exact date this was, but I do specifically remember her saying that it had been two weeks since her flu shot, and that her arm had continuously hurt since.
> Thank you,
> Kaitlyn Ekema, PCT, TMC Pediatrics/PICU.

Pet'r's Ex. 14 at 7; Pet'r's Ex. 16 at 1.

### iii. Matthew Brady

Mr. Brady is also a registered nurse and Petitioner's co-worker. Pet'r's Ex. 15 at 1. Mr. Brady's first statement was an email submitted as a part of Petitioner's workers' compensation claim. Pet'r's Ex. 14 at 8. The email, dated April 19, 2018, read:

> On October 26th, 2017 [Petitioner] told me her arm hurt from the flu shot she received on October 24th, 2017. [S]he also said she could not lift her arm all the way up without it hurting.
> Thank you[,]

Matt Brady.

*Id*.

Mr. Brady's second statement was signed and dated April 26, 2019. Pet'r's Ex. 15 at 2. Mr. Brady wrote that he and Petitioner received the flu shot on October 24, 2017. *Id*. at 1. "Two days later on October 26, 2017," Mr. Brady wrote that his soreness had gone away, but Petitioner "was complaining that her shoulder and arm were still in extreme pain." *Id*. Mr. Brady noted that he "could tell by looking at her face that she was in pain." *Id*. Mr. Brady wrote that Petitioner told him that "it felt different from previous vaccinations and it was much more painful." *Id*. Mr. Brady described how Petitioner "would have difficulty at work," specifically he "saw that she was having trouble lifting anything because of her arm." *Id*. at 1–2. He wrote there is "no question that I personally saw and discussed with [Petitioner] the complaints she was having with her shoulder two days after vaccination." *Id*. at 2. Mr. Brady asserted that it was "clear that her complaints started immediately after the vaccination, and they were certainly present within 48 hours of her shot." *Id*.

### III.   Parties' Arguments

#### a.   Petitioner

Petitioner's memorandum regarding onset is largely a recitation of her medical record. *See* Pet'r's Br. Petitioner notes that "Respondent objects to the length of time between vaccination and the first medical record reflecting [Petitioner's] shoulder injury," and "also highlighted concerns of pre-existing neck pain." *Id*. at 16–17. Petitioner responds by arguing that her attestation of an immediate onset of pain is corroborated by her witnesses. *Id*. at 17. Petitioner also argues that beginning with her first medical visit post vaccination, she consistently and unequivocally identifies her pain onset as immediately following her vaccination. *Id*. Petitioner acknowledges that "she waited to seek medical treatment," but reiterates her belief that "she could treat this issue on her own" until it was apparent that she could not. *Id*. Lastly, she acknowledges that "she had long-standing neck complaints," but argues that her neck injury is different from her SIRVA in how it was assessed and treated. *Id*.

#### b.   Respondent

Respondent argues that Petitioner has failed to present evidence that her pain began within 48 hours of her flu vaccine. Resp't's Resp. at 5. He notes that "there are no contemporaneous records, medical, employment, or otherwise, until she first reports her symptoms about five-and-a-half months later, placing in doubt any recollection by [P]etitioner or her witness that her pain began soon after the vaccine." *Id*. (citing Pet'r's Ex. 9 at 32–33). Respondent also contends Petitioner's witness statements are not credible due to vagueness, and/or "the passage of time" between the preparation of the statements and the conversations described therein that took place eighteen months earlier. Resp't's Resp. at 6. Respondent argues that Mr. Brady's recollection that Petitioner's ROM was "'severely limited, and she could not life her arm up without it hurting' is not easily reconciled with her failure to seek medical treatment for many months." *Id.* (citing

Pet'r's Ex. 15 at 2). Respondent argues this is more consistent with Petitioner's pain beginning six months post vaccination. Resp't's Resp. at 6 (citing Pet'r's Ex. 9 at 32–33).

## IV.    Applicable Legal Standard

To receive compensation under the Vaccine Act, Petitioner must demonstrate either that: (1) she suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as amended by 42 C.F.R. § 100.3; or (2) that she suffered an "off-Table injury," one not listed on the Table as a result of her receipt of a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006).

The Vaccine Injury Table considers a SIRVA a presumptive injury for the flu vaccine if the first symptom or manifestation of onset of the illness occurs within forty-eight hours of an intramuscular vaccine administration. *See* 42 C.F.R. § 100.3(a)(XIV).

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove their claim by a preponderance of the evidence. A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1).

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen v. Sec'y of the Dept. of Health & Hum. Servs.*, 418 F.3d 1274, 1278–79 (Fed. Cir. 2005)). This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *See id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 933 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Id.* However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition.). While a special master must consider these

opinions and records, they are not "binding on the special master or court." 42 U.S.C. § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete.

## V.    Analysis of Shoulder Injury Onset

Although I am not bound by the chief special master's conclusions prior to the reassignment of this case to me, I ultimately agree with Chief Special Master Corcoran that Petitioner has provided preponderant evidence that her shoulder pain began within 48 hours of vaccination. This case is fairly straightforward, as Respondent's main contentions are that Petitioner has a pre-existing shoulder injury, and that she did not seek medical treatment for an extended period of time. Contrary to Respondent's assertions, these issues can be easily reconciled.

### a.  Pre-vaccination injury

Petitioner's medical records prior to her vaccination document a localized chronic neck injury with occasional complaints of left arm paresthesia. Petitioner described her neck pain as sharp and rated it a ten out of ten at its worst. She said it waxed and waned with numbness radiating into her arm. She received treatment from 2014 through July of 2016, to include prescription medication and physical therapy. In April of 2018, Petitioner first complained of a vaccine-related shoulder injury, but she did not complain of neck pain or arm numbness at that time. Petitioner described her shoulder pain as a constant ache that was exacerbated with lifting.  She also noted that the pain was initially manageable, and she was able to self-treat with over-the-counter medication for a period of several months. There is a clear distinction between the location and nature of the pain that Petitioner experienced in her neck prior to her vaccination and in her shoulder post vaccination. Petitioner has a pre-vaccination history that includes symptoms affecting her shoulder. However, there is a period of time of over a year between the last recorded medical visit for her neck injury and the first visit post vaccination, wherein she complained of the shoulder injury. That period of time and the different nature of her reported symptoms provide preponderant evidence that Petitioner's injuries are distinct.

### b.  Delay in seeking medical treatment

It is true that Petitioner does not have medical records that document a complaint of shoulder pain consistent with SIRVA to a medical provider for more than five-and-a-half months post vaccination. However, when Petitioner did finally seek treatment for her shoulder pain on April 4, 2018, and thereafter, she consistently related it back to her vaccination. Petitioner credibly explained that she did not seek treatment immediately, because she has received vaccines in the past and expected some degree of soreness and pain. She also relied on her occupation as a nurse to explain that she, too, "grins and bears it" when something hurts. She said she attempted to self-

treat her pain with over-the-counter medication, which helped manage her pain initially. She also described how during the months immediately post vaccination, she was able to function at work, because her temporary contract with Kaiser as a traveling nurse was less physically demanding than her permanent duties with TMC. Although contemporaneous medical records often contain evidence that is contradictory to a petitioner's claim, the lack of medical records or treatment is not *per se* evidence that a petitioner was not suffering from an injury. *See* 42 U.S.C. § 300aa-13(b)(2); *see also Kirby*, 997 F.3d at 1383. Indeed, it is not uncommon in the Program for individuals not to seek treatment immediately for shoulder pain post vaccination. *See, e.g., Lang v. Sec'y of Health & Hum. Servs.*, No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (citing *Forman-Franco v. Sec'y of Health & Hum. Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018); *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied* 142 Fed. Cl. 329 (2019); *Gurney v. Sec'y of Health & Hum. Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Spec. Mstr. Mar. 19, 2019)). In fact, it is not at all unusual for people not to seek immediate medical care for an injury consistent with SIRVA and special masters have determined that such claims may succeed despite delayed treatment. *See, e.g., Hanna v. Sec'y of Health & Hum. Servs.*, No. 18-1455V, 2021 WL 3486248 (Fed. Cl. Spec. Mstr. July 15, 2021) (citing *Lang*, 2020 WL 7873272, at *10 (noting that "[R]espondent's expert has conceded that there is no such thing as an 'appropriate' time to seek treatment" for SIRVA); *Smallwood v. Sec'y of Health & Hum. Servs.*, No. 18-291V, 2020 WL 2954958, at *10 (Fed. Cl. Spec. Mstr. Apr. 29, 2020) (finding that it is "common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own.")). Petitioner has therefore presented a logical explanation for her delay in seeking medical treatment.

### c.  Evidence of onset

The statements provided by Mr. Brady and Ms. Ekema as direct evidence in this case were filed in April of 2019. Respondent argues that these statements were drafted approximately eighteen months post vaccination and should be discounted due to the passage of time. This argument, however, is inapplicable to the statements that these witnesses submitted as a part of Petitioner's workers' compensation claim in April of 2018.

Ms. Ekema's statements are not dated. Furthermore, the two documents signed by Ms. Ekema are copies of the same statement, and there is little substantive information within the statement relating to the onset of Petitioner's pain. Ms. Ekema references a conversation that she had with Petitioner in November of 2016, but Petitioner received the vaccine at issue in October of 2017. It is unclear if Ms. Ekema mixed up the dates, but ultimately, her statement is less persuasive given the erroneous 2016 date she referenced and the statement's overall vagueness.

Mr. Brady, however, provided support for Petitioner's assertion that she complained of pain immediately post vaccination. Mr. Brady provided two distinct statements for Petitioner's workers' compensation claim and her vaccine injury claim. Mr. Brady's email statement from April 19, 2018, explained that Petitioner complained of arm pain from her flu shot on October 26, 2017, two days post vaccination. He also wrote that Petitioner told him, "she could not lift her arm all the way up without it hurting." Pet'r's Ex. 14 at 8. He wrote that she experienced pain when she did. The email is credible in its simplicity. There does not appear to be any effort to assist in

Petitioner's litigation. The email is a recounting of his conversation with Petitioner. Mr. Brady did not reach conclusions with legal significance.

Mr. Brady is more explicit in his second statement regarding the onset of Petitioner's symptoms and the type of pain that she experienced. It is curious that he is able to remember so much more detail in this later statement that is dated over a year after his initial email. However, context is probative. His second statement does not appear exactly in line with Petitioner's own accounting that she was able to self-treat and ignore the pain in the days immediately post vaccination, as Mr. Brady noted he could tell by looking at her face that Petitioner was in pain. It is possible, however, that Petitioner believed that she was masking the pain, but was ultimately unsuccessful. Mr. Brady's recollection of Petitioner's post-vaccination pain is further supported by the fact that they received their flu shots on the same day, but while his soreness dissipated two days post vaccination, Petitioner was still experiencing extreme pain. Pet'r's Ex. 15 at 2. While Mr. Brady does provide much more detail in his second account, prepared nearly eighteen months post vaccination, his statements are consistent with all the other evidence that Petitioner experienced arm pain immediately following the vaccination.

Given Petitioner's statement that immediately post vaccination her job did not require manual patient transfer and lifting, it is reasonable that despite extreme pain with certain movements, she would have initially attempted "to ignore her pain and work through it." *See* Pet'r's Br. at 7. There is no dispute that once Petitioner did seek treatment, she never identified an alternative cause for her shoulder pain and consistently attributed it to the flu vaccine. There is also evidence in the medical records that once Petitioner did seek treatment, her medical providers believed her injury to be vaccine-related. Respondent is correct that Ms. Ekema's statement is unreliable; however, the same cannot be said with respect to Mr. Brady's statement. Therefore, I find that Petitioner has established it more likely than not that she experienced shoulder pain within 48 hours of her flu vaccination.

## VI.    Conclusion

Based on the above reasoning, I find that Petitioner has provided evidence establishing it more likely than not that she experienced left shoulder pain within 48 hours of her vaccination. Petitioner and Respondent have fourteen (14) days from the filing of this ruling to file a joint status report indicating how they wish to proceed.

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

11